**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN CARROLL and DAWN CARROLL,** | : | No. 1:22-cv-00242 |
| **Plaintiffs** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF TRANSPORTATION, VALLEY QUARRIES, INC., and NEW ENTERPRISE STONE & LIME CO., INC.,** | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

Before the Court are Plaintiffs John Carroll and Dawn Carroll ("Plaintiffs")' fully briefed motion to exclude the opinions of James M. Thompson pursuant to Federal Rule of Evidence 702 (Doc. No. 84) and Defendant Commonwealth of Pennsylvania, Department of Transportation ("Defendant" or "PennDOT")'s fully briefed motion to exclude the testimony and opinions of Brian A. Coon pursuant to Federal Rule of Evidence 702 (Doc. No. 82). Neither Plaintiffs nor Defendant requested a hearing on the pending motions. Upon careful consideration of the briefing, exhibits, and applicable law, and for the reasons provided herein, the Court will grant in part and deny in part the parties' motions.

**I.    BACKGROUND**

This case arises from Plaintiffs' single-vehicle collision on Interstate 81 near Carlisle, Pennsylvania—an area of highway maintained by PennDOT. (Doc. No. 60 at 1, 4.) Plaintiffs' vehicle veered into the lefthand shoulder of the highway and struck the guiderail, which penetrated the vehicle and injured the driver, Plaintiff John Carroll. (<u>Id.</u> at 1.) A guiderail (also known as a guardrail) is a common roadway safety barrier intended to prevent motorists from

striking objects that would be more detrimental than hitting the guiderail itself. (Doc. Nos. 60, 63.) When Plaintiffs' vehicle struck the guiderail ("Subject Guiderail"), it "speared through the driver's side" and "sliced through Plaintiff John Carroll's left lower limb causing serious personal injuries." (Doc. No. 23 ¶ 22.) Plaintiffs contend that the Subject Guiderail "did not react … as anticipated or designed" because PennDOT failed to "reasonably install, inspect, and/or maintain" it. (Id.) Plaintiffs assert that while the Subject Guiderail should have "absorb[ed] the energy" of the impact, it instead "penetrat[ed] Plaintiffs' vehicle and spear[ed] through it." (Doc. No. 23 ¶ 2–5.)

On February 18, 2022, Plaintiffs initiated this action by filing a complaint against PennDOT and other unnamed Defendants. (Doc. No. 1.) On April 28, 2022, Plaintiffs filed their First Amended Complaint alleging state law claims of negligence, vicarious liability, negligent infliction of emotional distress, and loss of consortium. (Doc. No. 12.) During discovery, Plaintiffs learned that Defendants Valley Quarries, Inc. and New Enterprise Stone & Lime Co., Inc. ("Valley Quarries et al.")[1] had installed the Subject Guiderail, and Valley Quarries et al. were added as Defendants in Plaintiffs' operative Second Amended Complaint. (Doc. No. 23.)[2]

---

[1]  Valley Quarries, Inc. is a fictitious name owned by New Enterprise Stone & Lime Co., Inc. Valley Quarries, Inc. was merged into New Enterprise Stone & Lime Co., Inc., effective August 5, 2010. (Doc. No. 50 at 1 n.1.) In their answer to Plaintiffs' complaint, Valley Quarries, Inc. and New Enterprise Stone & Lime Co., Inc. refer to themselves as a singular Defendant. Plaintiffs refer to them as Defendants. The Court refers to Valley Quarries, Inc. and New Enterprise Stone & Lime Co., Inc. in the plural tense because they are two of the named Defendants in the operative Second Amended Complaint. See (Doc. No. 23).

[2]  Upon receiving Rule 26 Disclosures from PennDOT, Plaintiffs discovered that the last guiderail update had been in 1998. (Doc. No. 51-4.) PennDOT then produced construction drawings from its 1998 Highway Improvement Project and identified Valley Quarries et al. as the contractors. (Doc. Nos. 50 at 6; 51-1.) No party disputes that Valley Quarries et al. are listed as the contractors of the project where the Subject Guiderail was installed. (Doc. Nos. 51 ¶ 5; 55 ¶ 5; 60 ¶ 16; 65 ¶ 16.)

In Plaintiffs' operative complaint, Plaintiffs assert the following claims: negligence against all Defendants (Count I); vicarious liability against PennDOT for Valley Quarries et al.'s alleged negligence (Count II); negligent infliction of emotional distress against all Defendants (Count III); and loss of consortium against all Defendants (Count IV). (Id.)

After an additional period of discovery, Valley Quarries et al. filed a motion for summary judgment on September 14, 2023 with a brief in support and a statement of material facts. (Doc. Nos. 49–51.) Valley Quarries et al. argued that all claims against them were barred by the Pennsylvania Statute of Repose because the Subject Guiderail was installed more than twelve (12) years ago. (Doc. No. 50 at 9, 11.) On October 20, 2023, PennDOT filed its own motion for summary judgment arguing that it did not fail in its duty "to assemble, install, maintain, and inspect" the Subject Guiderail and that it is entitled to sovereign immunity. (Doc. Nos. 58, 59, 59-1 through 59-7, 60.) After the parties fully briefed the motions (Doc. Nos. 55–56, 61–63, 65), the Court issued a Memorandum and Order granting Valley Quarries et al.'s motion and deferring entry of judgment in their favor until the conclusion of the case, granting PennDOT's motion in part as to Plaintiffs' claim of vicarious liability (Count II), and denying PennDOT's motion as to its remaining claims of negligence (Count I), negligent infliction of emotional distress (Count III), and loss of consortium (Count IV). (Doc. Nos. 68–69.) The Court concluded that "Plaintiffs' forthcoming expert discovery impacts the Court's analysis of the remaining counts of Plaintiffs' Second Amended Complaint because Plaintiffs claim that their expert will 'express opinions about the duties of PennDOT to install, maintain, and inspect the Subject Guiderail to prevent and/or identify the dangerous condition.'" (Doc. No. 68 at 18.)

3

After a case management conference on August 8, 2024 (Doc. No. 71), Plaintiffs and PennDOT submitted a joint proposed case management plan for expert discovery (Doc. No. 72). The Court adopted the parties' joint case management plan and set a close of expert discovery date of December 13, 2024.  (Doc. No. 73.)  During expert discovery, PennDOT filed a motion to extend the expert discovery deadlines (Doc. No. 74) and Plaintiffs filed a brief in opposition (Doc. No. 75).  The Court granted the motion in part, permitting PennDOT until November 14, 2024 to provide its expert report to Plaintiffs and extending the expert discovery deadline to December 30, 2024.  (Doc. No. 76.)  On January 28, 2025, the Court conducted a status conference with the parties to set a briefing schedule for <u>Daubert</u> motions.  (Doc. Nos. 77–78.) Thereafter, by agreement of the parties (Doc. No. 80), the briefing schedule was modified and the deadline for reply briefs was extended to April 30, 2025 (Doc. No. 81).

On March 17, 2025, the parties each filed a <u>Daubert</u> motion (Doc. Nos. 82, 84) with supporting briefs (Doc. Nos. 83, 85).  After briefs in opposition to the <u>Daubert</u> motions were filed (Doc. Nos. 88–89), the parties filed reply briefs to the briefs in opposition to the pending motions (Doc. Nos. 91–92), making the motions ripe for disposition.[3]

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  <u>See</u> Fed. R. Evid. 702.  Rule 702 states, in relevant part:

---

[3]  The Court finds that the record here is adequate for resolution of the pending motions despite the fact that neither party requested, and the Court has not held, an evidentiary hearing on the motions.  Plaintiffs' expert authored two reports and issued a supplemental affidavit in response to Defendant's <u>Daubert</u> motion, and Defendant's expert authored a report and sat for a deposition.  This record constitutes a sufficient basis upon which to decide the motions.  <u>See</u> <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 151–55 (3d Cir. 2000) (finding that an evidentiary hearing was not required given that "the evidentiary record pertaining to Oddi's expert was far from scant").

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

See Fed. R. Evid. 702. As the United States Court of Appeals for the Third Circuit has explained, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." See Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). The rule imposes an obligation on district court judges to act as "gatekeepers" to ensure that an expert witness's testimony meets those three threshold requirements before consideration by a jury. See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). In fulfilling its obligation as a gatekeeper, a court exercises discretion when deciding whether to admit or deny expert testimony. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146–47 (1997). Rule 702 was amended in 2023 to make clear that "expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." See Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

When considering the qualification requirement, a court must discern whether a purported expert has specialized knowledge in a given field. See Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008). No particular background or credentials are necessary to establish

the requisite specialized knowledge, as "a broad range of knowledge, skills, and training qualify an expert." See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); accord Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998) (noting that a proposed expert witness's generalized knowledge or practical experience may be sufficient to qualify him as an expert). The Third Circuit has instructed courts to "eschew[] imposing overly vigorous requirements of expertise," but the determination is not a mere formality, and the Court's assessment of a proposed expert's qualifications is predominantly a fact-specific endeavor that is governed by the unique circumstances in each case. See Voilas v. Gen. Motors Corp., 73 F. Supp. 2d 452, 456 (D.N.J. 1999) (quoting United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995)).

As to reliability, the United States Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." See Kumho Tire, 526 U.S at 152. To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable," but the "evidentiary requirement of reliability is lower than the merits standard of correctness." See Pineda, 520 F.3d at 244 (quoting In re Paoli, 35 F.3d at 744). The expert's opinion "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." See In re TMI Litig., 193 F.3d 613, 664 (3d Cir. 1999). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 331 (M.D. Pa. 2009) (citing In re Paoli, 35 F.3d at 746).

6

When evaluating the reliability of a witness's methodology, a court is guided by several factors drawn from <u>Daubert</u>:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

<u>See</u> <u>In re Paoli</u>, 35 F.3d at 742 n.8.  The inquiry is flexible, and each listed factor "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  <u>See</u> <u>Kumho Tire</u>, 526 U.S. at 150.  The court should also consider other relevant factors.  <u>See</u> <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 321 (3d Cir. 2003).

As to fit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  <u>See</u> <u>Schneider</u>, 320 F.3d at 404.  "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  <u>Daubert</u>, 509 U.S. at 591-92.  Indeed, an expert who renders an opinion based on factual assumptions not present in the case or opines on a matter that does not relate to a disputed issue is not relevant and, thus, will not assist the trier of fact, as required by Rule 702.  <u>See</u> <u>id.</u>  For example:

> The study of the phases of the moon . . . may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact.  However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

See id.  Like the typical relevance inquiry, "the standard for analyzing the fit of an expert's analysis to the case at hand is 'not that high.'"  See United States v. Ford, 481 F.3d 215, 219 n.6 (3d Cir. 2007) (quoting In re Paoli, 35 F.3d at 745).  Still, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of Daubert."  See id. at 219 n.6.

## III.    DISCUSSION

As an initial matter, to provide context to the opinions proffered by and challenged by the parties, the Court briefly reviews the law relevant to the pending negligence claim and to the question of the applicability of sovereign immunity before addressing each motion.

### A.    Relevant Law

To prevail on a negligence claim under Pennsylvania law, a plaintiff must establish: (1) a duty owed to the plaintiff; (2) a breach of that duty by the defendant; (3) a causal connection between the defendant's breach and the resulting injury; and (4) injury suffered by the plaintiff. See Estate of Zimmerman v. Se. Pa. Transp. Auth., 168 F.3d 680, 684 (3d Cir. 1999) (citing Estate of Swift v. Northeastern Hosp. of Phila., 690 A.2d 719, 722 (Pa. Super. Ct. 1997)).  To prove the breach of a legally recognized duty or obligation of the defendant, the plaintiff must show that "the defendant's act or omission fell below the standard of care, and therefore, increased the risk of harm to the plaintiff."  See Green v. Pa. Hosp., 123 A.3d 310, 316 (Pa. 2015) (citing Scampone v. Highland Park Care Ctr., LLC, 57 A.3d 582, 596 (Pa. 2012)).

The Commonwealth of Pennsylvania generally enjoys immunity from suit under the Pennsylvania Sovereign Immunity Act.  See 42 Pa. C.S. §§ 8521–22.  However, immunity is

waived "for damages arising out of a negligent act where the damages would be recoverable under the common law or a statute creating a cause of action if the injury were caused by a person not having available the defense of sovereign immunity."  See 42 Pa. C.S. § 8522(a).  Relevant to the present action, immunity is waived for damages caused by:

> (4) Commonwealth real estate, highways and sidewalks.—A dangerous condition of Commonwealth agency real estate and sidewalks, including Commonwealth-owned real property, leaseholds in the possession of a Commonwealth agency and Commonwealth-owned real property leased by a Commonwealth agency to private persons, and highways under the jurisdiction of a Commonwealth agency, except conditions described in paragraph (5).

> (5) Potholes and other dangerous conditions.—A dangerous condition of highways under the jurisdiction of a Commonwealth agency created by potholes or sinkholes or other similar conditions created by natural elements, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the Commonwealth agency had actual written notice of the dangerous condition of the highway a sufficient time prior to the event to have taken measures to protect against the dangerous condition. Property damages shall not be recoverable under this paragraph.

See id.  The Supreme Court of Pennsylvania has specifically held that when "PennDOT installs a guardrail, sovereign immunity is waived if the agency's negligent installation and design creates a dangerous condition."  See Cagey v. Commonwealth, 179 A.3d 458, 467 (Pa. 2018).

### B.    Motion to Exclude the Opinions of Brian A. Coon

#### 1.    The Proposed Expert Report and Testimony of Brian A. Coon

Plaintiffs have tendered Dr. Brian A. Coon ("Dr. Coon"), an engineer and accident reconstructionist, as an expert to "assist the jury in understanding why the guiderail responded in [the manner that it did], the mechanism of failure of the guiderail, and the duties and responsibilities of PennDOT related to the subject guiderail."  (Doc. No. 89 at 3.)

Dr. Coon issued two reports ("Dr. Coon's Initial Report" and "Dr. Coon's Supplemental Report") (Doc. Nos. 83-2, 83-3) supporting Plaintiffs' allegations that PennDOT failed to "reasonably install, inspect, and/or maintain" the Subject Guiderail, thus "compromis[ing] the efficacy" of the system and causing it to spear through Plaintiffs' vehicle.  (Doc. No. 23 ¶¶ 4–5.) In his reports, Dr. Coon points to three flaws in the Subject Guiderail that purportedly compromised its structural integrity: (1) the depth of the guiderail posts in soil, specifically the location of the posts' breakaway holes; (2) rotated blockouts; and (3) damage to the rail itself.  A guiderail post is embedded in the ground.  (Doc. No. 83-2 at 9–10.)  A breakaway hole is a hole in a guiderail post that acts as "a designed point for the post to break" upon impact because that point is "weaker than the other portions of the post."  (Id. at 9.)  Dr. Coon says that the top breakaway hole on a guiderail post should be at approximately ground level, or "finished grade," but that here the top breakaway holes of the Subject Guiderail were "considerably above finished grade."  (Id. at 9, 19.)  A blockout is a block of wood connecting the metal rail to the post.  (Id. at 15.)  Blockouts "affect how the posts rotate in soil in addition to reducing wheel snag," and "uniformly support the rail."  (Id. at 9; Doc. No. 83-3 at 11.)  Dr. Coon describes the Subject Guiderail's blockouts as having "rotated"—as in, they became diagonal or parallel to the ground rather than perpendicular and in line with the posts—because of the failure to "toe nail" them to the posts, which makes "the failure of the system more likely."  (Doc. No. 83-2 at 9.)  Lastly, he describes "noticeable damage" to the metal rail itself, "likely from nuisance strikes (mowing or snow removal operations, etc.)," which "reduce the guiderail's strength, thereby altering its capacity to safely redirect a vehicle."  (Id. at 15.)

Based on his assessment, Dr. Coon opines as follows:

10

(1)     PennDOT's failure to properly install, inspect, and maintain the Subject Guiderail caused the Subject Guiderail to be in an unreasonably dangerous condition prior to the accident;

(2)     At the time of the accident, the bottom of the top breakaway holes of the wooden posts were located considerably above finished grade, the blockouts had rotated, and there was nuisance strike damage to the rail, all of which compromised the structural integrity of the Subject Guiderail; and

(3)     For these reasons, the Subject Guiderail did not perform as designed, and instead, the rail pulled away from the wooden posts and speared Plaintiffs' vehicle.

(Doc. No. 83-2 at 22.)

PennDOT asks that the Court:

preclude the testimony of [Dr. Coon] in its entirety.  In particular, Dr. Coon: (1) is only qualified to opine about the behaviors of guide posts in soil; (2) has not presented a reliable opinion that the alleged dangerous conditions he identifies caused the guiderail to split in the manner that it did; and (3) has presented opinions that are not relevant to the remaining claims at issue.

(Doc. No. 83 at 2.)  The Court addresses each of Defendant's challenges in turn.

## 2.    Dr. Coon's Qualifications

In challenging Dr. Coon's opinions, PennDOT argues that Dr. Coon "is only qualified to provide testimony in a limited area."  (Doc. No. 82 at 1.)  Specifically, Defendant argues that Dr. Coon's "expertise is narrowly confined to guiderail posts, and not guiderail paneling," and thus his opinions as to guiderail paneling should be excluded.  (Doc. No. 83 at 6.)  Plaintiffs counter that Dr. Coon "has extensive experience studying, testing, and evaluating guiderails as a whole, including every component within the guiderail assembly system."  (Doc. No. 89 at 8.)

Upon careful consideration of the parties' briefing and exhibits, and the applicable law, the Court concludes that Dr. Coon is qualified to offer opinions and testimony about guiderail systems generally.  Dr. Coon holds a Bachelor of Science in Engineering from the University of

Iowa, a Master of Science in Engineering and Ph.D. in Engineering from the University of

Nebraska-Lincoln, and a law degree from the University of Nebraska College of Law.  (Doc. No.

89-4 at 2.)  He has authored numerous journal articles, conference papers, and research reports

on topics relating to traffic safety, several of which address safety barriers and guiderails.  (Id.)

Dr. Coon also has a long history of relevant professional experience.  He served as an accident

reconstructionist and research engineer at the Midwest Roadside Safety Facility from 1997 to

2006, the Chief Traffic Engineer for Wichita, Kansas from 2008 to 2019, and a project manager

with a focus on traffic control and devices at an engineering firm from 2019 to 2021.  (Id.)  Dr.

Coon also taught engineering courses as an Associate Professor at Kansas State University and

environmental science courses as an Adjunct Professor at Friends University.  (Id.)  He was also

a Commissioned Police Officer from 2009 to 2017.  (Id.)  Dr. Coon has been qualified as an

expert witness in both federal and state cases involving motor vehicle accidents.  (Id.)  Dr. Coon

clearly has the requisite background and experience to opine as an expert with respect to

guiderail systems.  See Pineda, 520 F.3d at 244–45 (reversing the District Court's exclusion of

an expert and stating that the "liberal policy of admissibility extends to the substantive as well as

the formal qualifications of experts").  Upon consideration of the above, the Court finds that Dr.

Coon is qualified to offer testimony as an expert in this case without the subject matter limitation

sought by PennDOT, and accordingly, turns to an assessment of the reliability of his opinions

offered in this case.

3.    **Reliability**

As set forth more fully above, the reliability inquiry focuses on the expert's methodology and whether he has "good grounds" for the opinion offered.  See In re Paoli, 35 F.3d at 746. Relevant factors to consider include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See id. at 742 n.8.

Of Dr. Coon's three conclusions, Defendant only challenges the reliability of the third:

> (1)    PennDOT's failure to properly install, inspect, and maintain the Subject Guiderail caused the Subject Guiderail to be in an unreasonably dangerous condition prior to the accident;
>
> (2)    At the time of the accident, the bottom of the top breakaway holes of the wooden posts were located considerably above finished grade, the blockouts had rotated, and there was nuisance strike damage to the rail, all of which compromised the structural integrity of the Subject Guiderail; and
>
> (3)    For these reasons, the Subject Guiderail did not perform as designed, and instead, the rail pulled away from the wooden posts and speared Plaintiffs' vehicle.

(Doc. No. 83-2 at 22.)  Dr. Coon's first two conclusions bear on PennDOT's alleged failure to properly maintain the Subject Guiderail, the existence of a dangerous condition, and the specific dangerous elements that he identified.  Although PennDOT does not challenge their reliability, the Court must still act as a gatekeeper to ensure that Dr. Coon's first two conclusions are "based on the methods and procedures of science rather than on subjective belief or unsupported speculation."  See In re TMI Litig., 193 F.3d at 664.

To reach these first two conclusions, Dr. Coon assessed photographs of the scene of the accident, historical photographs of the Subject Guiderail and surrounding area, referred to highway safety publications, PennDOT publications, and other installation manuals, and relied generally on his "experience, education, testing, and observations."  (Doc. No. 83-2; Doc. No. 89-5 at 2.)  He explains:

> The National Cooperative Highway Research Program (NCHRP) Report 350 is the guiderail testing standard for the SRT-350. The SRT-350 is a proprietary flared non-energyabsorbing terminal designed to break away when impacted end-on. The SRT-350 was successfully tested to NCHRP Report 350, TL-3. The "350" in "SRT-350" designates that it is "NCHRP Report 350 compliant."
>
> As NCHRP Report 350 notes at section 7.4, "Past research has shown that seemingly minor variations in design details can adversely affect the safety performance of a feature." For this reason alone, it is critical that roadside safety appurtenances are correctly installed according to manufacturer's recommendations, which generally matches the as-tested design.
>
> Specifically, for example, to the SRT installation manual requires "the bottom of the upper 3 1/2" (90 mm) hole in the post is approximately at finished grade," as shown in Figure 9." The holes allow the post to break away by reducing the post material by drilling. The reduced crosssection is weaker than the other portions of the post, causing the failure mode to be through the holes. The Controlled Release Terminal (CRT)'s holes are like a fuse, a designed point for the post to break.
>
> …
>
> The placement of the posts is so critical that it is included in the final installation checklist of the SRT-350 Instruction Manual, as shown in Figure 12. Specifically, the breakaway holes "should be located parallel to the roadway with the bottom of the top hole located approximately at the finished grade." Additionally, the checklist requires the installer or inspector to confirm "Blockouts have been toe nailed to the posts." This prevents the blockouts from rotating such that they no longer provide proper support to the guiderail.
>
> …
>
> One of the maintenance tasks for the SRT 350 is that of ensuring that the blockouts have not rotated, as shown in Figure 13. The period maintenance required by the manufacturer was "periodically checking …the blockouts have not rotated."

14

…

Additionally, damage likely from nuisance strikes (mowing or snow removal operations, etc.) is also visible. Bends in the guiderail reduce the guiderail's strength, thereby altering its capacity to safely redirect a vehicle.

(Doc. No. 83-2 at 9, 12, 14, 15.)  He further opines, with citations to PennDOT publications, that

PennDOT was aware of its responsibility to properly install and maintain guiderails:

Based on my review of the materials in this case, PennDOT was aware of and acknowledges its responsibility [to] properly install and maintain guiderails. For example, PennDOT Publication 652 states, "The purpose of this document is to summarize important information…into a pocket guide that can be used in the field to ensure that all barrier installations are built and maintained to current standards and can be expected to perform acceptably when hit." As another example, PennDOT Publication 23, Bureau of Maintenance and Operations Maintenance Manual states, "Because interstates/expressways usually carry higher volumes of traffic, it is important that damaged guiderail systems in need of repair are done so in a timely manner to minimize risk exposure to the department and our motorists." And again, Publication 33 states, "Shoulder and Guide Rail Condition Survey Field Manual," states, "The guide rail survey is to be both an inventory of the barrier along Pennsylvania's highways and a survey of its conditions. The guide rail survey includes all systems along the roadside and in the median on state routes."

(Id. at 13.)

Under the familiar Daubert factors, see In re Paoli, 35 F.3d at 742 n.8, Dr. Coon

employed a generally accepted method (factors five and six) to arrive at his observational

conclusions as to the condition of the Subject Guiderail and his opinion about PennDOT's failure

to install and maintain the Subject Guiderail.  His use of and reference to PennDOT publications,

installation manuals, and other industry resources is a sensible approach to assessing the Subject

Guiderail in comparison to a properly installed and maintained guiderail.  See (Doc. No. 83-2 at

13 (compiling excerpts from PennDOT publications, including those intended "to ensure that all

barrier installations are built and maintained to current standards")).  Dr. Coon's extensive

15

background in traffic safety and engineering also weigh in his favor (factor seven), and the use of industry publications appears to be a highly common non-judicial use (factor eight); for example, a guiderail system is installed and maintained by reference to these very same resources, see (Doc. No. 83-2 at 11 ("Keiser further testified that PennDOT and its contractors were required to follow PennDOT's construction design manual")).  Accordingly, the Court finds that Dr. Coon's first two opinions are based upon a reliable methodology.

The Court next turns to Dr. Coon's third and final opinion, that as a result of the three deviations he identified—the bottom of the top breakaway holes of the wooden posts at considerably above finished grade, the rotated blockouts, and the nuisance strike damage to the rail—"the Subject Guiderail did not perform as designed, and instead, the rail pulled away from the wooden posts and speared Plaintiffs' vehicle."  (Doc. No. 83-2 at 22.)  PennDOT argues that it should be excluded because Dr. Coon "has not presented a reliable opinion that the alleged dangerous conditions he identifies caused the guiderail to split in the manner it did."  (Doc. No. 82 at 1.)  PennDOT argues further:

> Dr. Coon presents in his report the opinion that due to the dangerous conditions - breakaway holes considerably above finished grade, rotated blockouts, and nuisance strike damage—the guiderail at issue did not perform as designed and speared Plaintiffs' vehicle. However, while Dr. Coon's reports detail how it is his opinion that each of those items are dangerous conditions, at no point in either of his reports does Dr. Coon prove through his own testing or other research that shows that any of those three alleged dangerous conditions caused (or could cause) the paneling to split as a result of the accident in question and spear the Plaintiffs' vehicle. Instead, Dr. Coon vaguely cites that "[p]ast research has shown that seemingly minor variations in design details can adversely affect the safety performance of a feature."
>
> But Dr. Coon does not explain how a "variation[] in design detail," as discussed by the cited National Cooperative Highway Research Program (NCHRP) Report, is equitable to the alleged dangerous conditions identified by him. Even if Dr. Coon's position that each of these three conditions of the guiderail are dangerous conditions

is taken as true, which is strictly denied, other than making a conclusory statement, Dr. Coon never tests his theory or points to other research testing his theory, nor does he identify any practical experience he has to demonstrate that one or all of these conditions caused the guiderail panel to split and then spear Plaintiff's vehicle. This leaves the Court with nothing to evaluate pursuant to the <u>Daubert</u> factors.

(Doc. No. 83 at 7–8.)

Plaintiffs, in their response, cite to three items to demonstrate the reliability of Dr. Coon's methodology. (Doc. No. 89 at 10–11.) First, they point to his research and cite his assessment that guiderail post depth is "absolutely critical" (Doc. No. 83-3 at 3); second, they point to a report that Dr. Coon cites purportedly showing that "spearing incidents with steel guiderail beams has been a longstanding issue, especially with 'blunt-end' terminals"; and third, they cite to Dr. Coon's affidavit, in which he reiterates his conclusions and articulates the bases for them, including "direct experience, education, testing, and observations" (Doc. No. 89-5 at 2).[4]

The Court, upon careful consideration of the parties' briefing and exhibits, and the applicable law, and for the following reasons, finds that Dr. Coon's opinion as to causation does not reflect the reliable application of principles and methods to the facts of the case, and must therefore be excluded. The expert's opinion "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation." <u>See</u> <u>In re TMI Litig.</u>, 193 F.3d at 664. Here, Dr. Coon fails to demonstrate the necessary nexus between what he opines are the Subject Guiderail's three deviations—post depth, rotated blockouts, and rail damage— and the resulting incident. Dr. Coon does not clearly articulate his process or explain how

---

[4] Although Dr. Coon's affidavit was filed after expert discovery had closed, the Court will consider it in light of the Third Circuit's instruction that trial courts ensure the record is "adequately developed to allow for a meaningful evidentiary determination" as to whether to exclude expert testimony. <u>See</u> <u>Oddi</u>, 234 F.3d at 153.

exactly these deviations caused the accident to unfold as it did.  See Elcock v. Kmart Corp., 233 F.3d 734, 747 (3d Cir. 2000) (stating that "because [the expert] never explained his method in rigorous detail, it would have been nearly impossible for Kmart's experts to repeat [his] apparently subjective methods, or, in the nomenclature of Paoli II, to find that his 'method consists of a testable hypothesis' for which there are 'standards controlling the technique's operation'") (quoting In re Paoli, 35 F.3d at 742 n.8).  He does not specify, for instance, whether each deviation was alone sufficient to cause the Subject Guiderail to pull away from the wooden posts and spear Plaintiffs' vehicle, or whether they were only sufficient in combination.  He does not rule out alternative explanations or weigh the effects of other variables.  "[A] litigant has to make more than a prima facie showing that his expert's methodology is reliable."  Pineda, 520 F.3d at 244 (quoting In re Paoli, 35 F.3d at 744); see also Fed. R. Evid. 702 advisory committee's note to 2023 amendment (stating that "each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology").

Addressing Plaintiffs' arguments in turn, Dr. Coon's conclusion that post depth is "absolutely critical" may be relevant, but he does not articulate a methodology by which he establishes that the Subject Guiderail's post depth caused the accident to unfold as it did.  For instance, he does not describe what post depth causes what kind of reaction, under which circumstances, nor does he explain why the post depth here (which he does not specifically identify) caused the guiderail to spear the vehicle.  As in Oddi, Dr. Coon does not appear to have determined "what force was inflicted on the guardrail," "the strength or rigidity of the guardrail,"

18

"how much force it could hold," the relevant properties of Plaintiffs' vehicle, or other potentially

relevant factors.  See Oddi, 234 F.3d at 149.

Dr. Coon's assertion that post depth is "absolutely critical" appears to be drawn from

research, including his own, into the placement of guiderail posts in rock and soil.  (Doc. No. 83-

3 at 3.)  Dr. Coon asserts in his Supplemental Report:

> Embedment depth, the hole locations, the soil material properties, the post
> dimensions, and the post material properties are all critical to ensuring the model
> adequately reflects reality.  In this case, during the rotation, the posts are designed
> to rotate in soil to absorb energy but then fracture at the holes to prevent vehicle
> snag and ridedown accelerations.
>
> This absorption of energy is important because less energy means a lower vehicle
> velocity with a lower chance of penetrating the vehicle.  Additionally, the guiderail
> system is designed to operate with the posts embedded at a certain depth.

(Doc. No. 83-3 at 3.)  Even taking the above as true, Dr. Coon does not illustrate how his

conclusion as to causation follows.  To say that "less energy means a lower vehicle velocity with

a lower chance of penetrating the vehicle" is useful context, but it does not mean that the

deviations he identifies in fact caused the spearing; further, the "ipse dixit" of the expert is

insufficient to demonstrate reliability.  See Joiner, 522 U.S. at 146 (explaining that "nothing in

either Daubert or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the ipse dixit of the expert"); see also

Mahmood v. Narciso, 549 F. App'x 99, 103 (3d Cir. 2013) (unpublished)[5] (stating that "[w]hile

it is possible that Dr. Skolnick had an independent basis to reach conclusions in his reports, they

scarcely contained analysis—beyond a litany of sources listed as reviewed—showing how he

---

[5]  The Third Circuit has acknowledged that its unpublished opinions may contain persuasive
reasoning.  See New Jersey, Dep't of Treasury, Div. of Inv. v. Fuld, 604 F.3d 816, 823 (3d Cir.
2010).

reached his conclusions," and "there was a tenuous link between the sources consulted and the conclusions reached in Dr. Skolnick's reports"); Cohen v. Cohen, 125 F.4th 454, 463 (3d Cir. 2025) (explaining that "while experts commonly extrapolate from existing data, here there is simply too great an analytical gap between [these studies] and the opinion proffered" (internal citations omitted)).

Plaintiffs also cite to a 1993 report of the National Cooperative Highway Research Program, which they say demonstrates the reliability of Dr. Coon's conclusion as to causation. See H.E. Ross, Jr., D.L. Sicking, & R.A. Zimmer, National Cooperative Highway Research Program, Recommended Procedures for the Safety Performance Evaluation of Highway Features 63 (1993) ("NCHRP Report 350"). This too is unpersuasive. Plaintiffs point to NCHRP Report 350 to argue that "spearing incidents with steel guiderail beams ha[ve] been a longstanding issue, especially with 'blunt-end' terminals."[6] (Doc. No. 89 at 11.) The report is cited in Dr. Coon's Supplemental Report, in a section in which he rebuts PennDOT's expert Dr. Thompson's report, arguing that Dr. Thompson's "conclusions are flawed due to his misunderstanding of how guiderail posts interact with soil." (Doc. No. 83-2 at 2.) The passage in Dr. Coon's Supplemental Report citing to NCHRP Report 350 reads:

IMPORTANCE OF REAL-WORLD TESTING

Instead of hypothesizing about how posts behaved while being impacted, which is what Mr. Thompson has done, I have performed actual physical testing. For example, Mr. Thompson calculates estimates for moment arms in a rigid block. My opinions are based on thousands of hours of physical testing of the guiderail posts embedded in soil, instrumented with strain gauges and string potentiometers, to determine the exact behavior of posts as they rotate in soil, as shown in Figure 2. What I learned from the physical testing, and what NCHRP Report 350 notes at

---

[6]  Neither Dr. Coon nor Plaintiffs cite to a specific passage in the report to support this claim, and the terms "spear," "spearing," and "blunt-end terminal" do not appear in the report.  See generally (Doc. Nos. 83-2, 83-3, 89).

section 7.4, "Past research has shown that seemingly minor variations in design details can adversely affect the safety performance of a feature." This is why real-world experience in the testing and simulation of guiderail posts embedded in soil is critical to the analysis of this impact.

(Id. at 2–3.) Dr. Coon did not perform real-world testing specific to this case, but rather he refers to his past work and publications. See (Doc. No. 89-5 at 2. ("I did not reconstruct this accident")). The quoted passage of NCHRP Report 350—that research has shown that "seemingly minor variations in design details can adversely affect the safety performance of a feature"—is not sufficiently specific or dispositive to constitute a reliable or replicable methodology. See Elcock, 233 F.3d at 747–48 (describing an expert's method as "unreliable because it is subjective and unreproducible," and explaining that "without an inkling as to the standards controlling" the method, "an expert trying to reproduce [it] would be lost"). The fact that a minor variation can harm safety performance does not mean that it will, or even that it is likely to do so. The authors of NCHRP Report 350, in the very chapter that Dr. Coon cites, urge caution, warning that the "objectives are general and all may or may not be applicable to a candidate safety feature." See NCHRP Report 350 at 63.

Lastly, Plaintiffs cite to Dr. Coon's affidavit, in which he asserts:

I have extensive experience studying and testing how guiderail systems will respond when blockouts are rotated and support posts are not in proper position, depth, or orientation. Along with reviewing other testing protocols, I personally conducted impact testing on guiderail support posts at different depths to evaluate the effects of embedment depth on the intended behavior of the guiderail system. [citing to Coon, B.A., J.D. Reid, and J.R. Rohde, Dynamic Impact Testing of Guardrail Posts Embedded in Soil, Final Report to the Federal Highway Administration, Transportation Research Report No. TRP-03-77-98, Midwest Roadside Safety Facility, University of Nebraska-Lincoln (1999) ("1999 MRSF Report").] Based on that testing research and my time reconstructing accidents involving guiderails, I have determined that when these exact dangerous conditions are present, guiderail panels may not perform properly, (i.e. breakaway, and/or gate in the manner intended) and instead, may stay in a fixed position like a blunt-end

21

terminal, turning the guiderail panels into steel spears that can pierce a motor vehicle, as they did in this case.  The danger of blunt-end terminals and other end terminals spearing passenger vehicles has been generally known, including to PennDOT, for several decades.

(Doc. No. 89-5 at 1–2.)  The 1999 MRSF Report concluded in relevant part:

> In the wooden post impacts, soil failure only occurred in the 4.8, 4.9, and 9.6 mls (10.7, 11.0, and 21.5 mph) impacts while post failure occurred in the 6.0, 6.7, and 8.9 mls (13.4, 15.0, and 19.9 mph) impacts. Post failure is attributed primarily to stress concentrations induced by the instrumentation of the posts, inherent variations in wood quality, and gradation variations within AASHTO M 147-65 (1990) Gradation "B" specifications. It should be noted that the sampling size is too small to make a statistical analysis in either the wooden or steel post impacts.

See 1999 MRSF Report at 57.  As with the previously discussed materials, Dr. Coon's affidavit and his reference to this report do not establish the necessary nexus between the data and his conclusion as to causation.  For one, he makes no attempt to explain why the testing research is conclusive here, when it appears to have involved only the testing of wooden posts with vehicles traveling up to approximately 20 miles per hour, when failure was attributed to various factors including "inherent variations in wood quality, and gradation variations," and when the authors cautioned that the "sampling size is too small to make a statistical analysis" with respect to the impacts.  See id.

Dr. Coon undoubtedly brings substantial education and experience to bear on the factual issues at the heart of this case, but qualification is not enough.  The proponent of the testimony must demonstrate "to the court that it is more likely than not" that "the testimony is the product of reliable principles and methods."  See Fed. R. Evid. 702.  The proffered support for Dr. Coon's opinion as to causation does not meet the burden to demonstrate the application of reliable principles and methods.  It does not allow for replication or refutation by other experts, leaving the Court with little to evaluate beyond the conclusion itself—another expert evaluating

22

Dr. Coon's method "would want to test the underlying hypotheses and review the standards controlling the technique's operation in an attempt to reproduce the results originally generated," but cannot do so given the conclusory nature of his assertions. See Elcock, 233 F.3d at 747. The Daubert factors, although each need not be applied in every case, are also instructive here:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

See In re Paoli, 35 F.3d at 742 n.8. Dr. Coon has not articulated a method consisting of a testable hypothesis (factor one)—specifically, there is not a way to prove or disprove his theory that the variations he identifies specifically caused the spearing of the vehicle. Some of the literature he cites has been subject to peer review (factor two), but none of it squarely addresses the circumstances in this case, nor was his process for reaching his conclusion sufficiently clear as to constitute a peer-reviewed method. There is no description or discussion of the potential rate of error (factor three). As to factors seven and eight, the Court accords weight to Dr. Coon's significant credentials and experience in the field and recognizes that he has been trusted by engineering and traffic safety organizations over many years. However, these factors do not outweigh the other relevant factors here.

Accordingly, the Court concludes that opinions one (1) and two (2) satisfy the reliability requirement, but opinion three (3) does not. The Court next assesses the "fit" of opinions one (1) and two (2) to the facts of this case.

###     4.      Fit

As to fit, PennDOT argues that the Court must exclude any testimony that "implies or otherwise attempts to state a legal duty attached to PennDOT other than what the [Pennsylvania] Supreme Court articulates in <u>Cagey</u>." (Doc. No. 83 at 9.) Defendant further states:

> The facts at issue that an expert could have assisted this court with determining are: (1) whether the alleged dangerous conditions identified by Dr. Coon caused the guiderail paneling to split and to spear Plaintiffs' vehicle upon impact; and (2) whether PennDOT had actual or constructive notice that the alleged dangerous conditions could cause the foreseeable harm of the panel splitting in the manner seen here. As described above, Dr. Coon fails to provide a reliable opinion on those particular issues, which makes the rest of his positions on this case irrelevant and inadmissible.

(<u>Id.</u>) Plaintiffs respond that Defendant's challenge is insufficiently particular and "mischaracterizes what the federal rules allow," noting that Federal Rule of Evidence 704(a) permits "an expert to opine on 'ultimate' issues such as these." (Doc. No. 89 at 13–14.)

Upon careful consideration of the parties' briefs and exhibits, and the applicable law, the Court concludes that Dr. Coon's first and second opinions fit the case. These opinions will help the trier of fact to resolve either the applicability of sovereign immunity or the issue of negligence, as the Court previewed in its prior ruling denying summary judgment, when it stated that "[t]he Court cannot resolve the issue of sovereign immunity at this stage when expert testimony on the existence of a dangerous condition is forthcoming," and "the anticipated expert testimony will provide information relevant to the resolution of [Plaintiffs' negligence claim]." (Doc. No. 68 at 19); <u>see</u> <u>Schneider</u>, 320 F.3d at 404 (stating that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact"). Defendant is correct that "it is not permissible for a witness to testify as to the governing law," but Dr. Coon has not proposed to do so here. <u>See</u> <u>United States v. Leo</u>, 941 F.2d 181, 196 (3d Cir. 1991) (stating that

"testimony concerning custom and practice was proper so long as the expert did not give his opinions as to legal duties that arose under the law").

### C.    Motion to Exclude the Opinions of James M. Thompson

#### 1.    The Proposed Expert Report and Testimony of James M. Thompson

Defendants have tendered Dr. James M. Thompson ("Dr. Thompson") as an expert, asking him to "review the circumstances of [the car accident at issue in this case] and provide an opinion on whether the condition of the guiderail at the time of the accident had any effect on the proper functioning of the guiderail."  (Doc. No. 85-1 at 2.)  He issued a report ("Dr. Thompson's Report"), in which he opines the following:

1.    The Carroll vehicle struck the guiderail downstream from the beginning of the end treatment, as evidenced by the position of the cable anchorage relative to the vehicle (Figures 4 and 5).

2.    Given that the vehicle struck the guiderail downstream from the end of the end treatment, the guiderail could not have gated out of the way, as that is a different failure mechanism requiring a nearly head-on strike.

3.    The rail in the end treatment buckled (Figure 5) during the incident, as it was designed to do.

4.    The wood posts in the end treatment all failed (Figure 6) as they were designed to do.

5.    The blockouts that hold the rail away from the posts had rotated slightly, but appeared to still be in contact with the rear face of the rail, and thus remained functional (Figures 12 and 14).

6.    The ground strap, which causes the two end posts to function together and serves to drag the force in the cable to their foundations is slightly above grade. Its slight elevation above grade does not impair its function.

7.    The surface damage on the rail on the end treatment was not sufficiently severe so as to impair the function of the end treatment, per the FHWA criteria.

Without any of the evidence from the scene, an accurate scene diagram, and a download of the vehicle's data, it is not possible to reconstruct the accident and understand how and why it occurred as it did. What is clear from the resulting damage to the vehicle and the end treatment is that the parameters of the accident did not match the testing parameters under which the guiderail was approved.

Based on the available evidence, all the elements of the end treatment were in place and functional at the time of the accident. Therefore, the guiderail was capable of performing as designed, and there are several indications in the available photographs that it did so, such as the broken posts and the buckled guiderail segment. In my opinion, to a reasonable degree of engineering certainty, at the time of the accident all the elements of the end treatment were in reasonable condition, and the end treatment and guiderail were capable of functioning as designed. Therefore, the guide rail and end treatment did not present a dangerous condition to motorists on northbound I-81.

(Doc. No. 85-1 at 22.)  Plaintiffs have moved to exclude Dr. Thompson's Report and his testimony (Doc. No. 84), arguing that "his credentials are lacking on the subject-matter on which he was asked to opine," "by extension, his opinions are necessarily unreliable," and "even assuming some relevant qualifications, his opinions simply do not fit the facts of the case" (Doc. No. 85 at 3).  Below, the Court addresses Dr. Thompson's qualifications, as well as the reliability and fit of his opinions.

### 2.      Dr. Thompson's Qualifications

Plaintiffs challenge Dr. Thompson's qualification to offer expert testimony in this case, arguing that "the problem with Mr. Thompson's qualifications is that his background is entirely devoid of any 'knowledge, skill, experience, training, or education' on guiderails."  (Doc. No. 85 at 6 (quoting Fed. R. Evid. 702).)  Plaintiffs point to Dr. Thompson's deposition testimony:

Q:      Before you were asked to investigate and serve as an expert in this case, did you consider yourself an expert in guiderails?

A:      I did not.

26

(Id.)  Plaintiffs also take issue with the fact that Dr. Thompson "had been disclosed as a litigation expert" only six or seven times, and "had never served as an expert in any case involving a guiderail."  (Id.)  They further assert that the materials he reviewed to self-educate are insufficient, and that "there must be depth and substance to a proffered expert's knowledge base."  (Id.)  Defendant responds that Dr. Thompson "does not need" specialized expertise in guiderails, citing to Third Circuit precedent to argue that "expert testimony cannot be excluded just because the expert does not have the most appropriate specialization."  (Doc. No. 88 at 4.)  Defendant asserts that, despite Dr. Thompson's lack of specific experience with guiderails, he is qualified because he "is a structural engineer with experience investigating and assessing highway and vehicle accidents," and "has several areas of specialties including failure analysis, structural engineering, structural analysis, and construction engineering."  (Id. at 5.)

Upon careful consideration of the parties' briefing and exhibits, and the applicable law, and for the following reasons, the Court concludes that Dr. Thompson is qualified to offer opinions and testimony in this case.  Dr. Thompson holds a Bachelor's Degree in Mechanical Engineering from Villanova University, a Master of Science in Civil (Structural) Engineering from Johns Hopkins University, and a Ph.D. in Civil (Structural) Engineering from Lehigh University.  (Doc. No 85-1 at 26.)  He worked as a structural engineer between 1992 and 1995, was a graduate research assistant and then a visiting research scientist at Lehigh University between 1995 and 2001, and was an Assistant Professor at Ohio University teaching various engineering courses between 2002 and 2009.  (Id. at 27.)  Dr. Thompson then worked as an assistant engineering manager for an engineering consulting firm between 2009 and 2011, a principal at another engineering firm from 2012 to 2013, and a consultant at a third engineering

firm from 2014 to 2020, where he is now a structural engineer.  (Id. at 26–27.)  Between 2012

and 2020, he was also an assistant teaching professor at Carnegie Mellon University, teaching

courses in civil and environmental engineering, and he is currently a part-time instructor at the

university.  (Id. at 26.)  He has also conducted research, authored publications, and given

presentations in the fields of structural and civil engineering.  (Id. at 29.)

As described above, "a broad range of knowledge, skills, and training qualify an expert."

See In re Paoli, 35 F.3d at 741; accord Waldorf, 142 F.3d at 627 (noting that a proposed expert

witness's generalized knowledge or practical experience may be sufficient to qualify him as an

expert).  Plaintiffs' argument that Dr. Thompson's background is insufficiently specialized is

unavailing.  Plaintiffs cite to F.E.I. Co. v. United States, 409 F. Supp. 3d 305 (M.D. Pa. 2019) for

the proposition that experts must have "specialized knowledge," but do not explain why that case

must persuade the Court to exclude Dr. Thompson's testimony here—the Court in F.E.I. deemed

the expert "qualified to offer expert testimony on the subject of ammonia adulteration of USDA-

regulated products" over the government's objection that "she lacks academic or professional

experience dealing with ammonia adulteration or the use of ammonia in food."  See F.E.I., 409

F. Supp. 3d at 314–17.

When asked during his deposition, Dr. Thompson explained why he believes he is

qualified to opine on guiderails despite his lack of prior experience with them:

> Q:    So can you tell me what makes you qualified to testify about guide rails in
> this case?
>
> A:    In this case, partly due to the questions being considered, the guide rail is
> really just a structure.  It's a structure designed to protect motorists and it
> behaves in ways that I am quite capable of understanding, based on my
> education, knowledge and experience.

Q:      Okay.  Are there any specific attributes or behaviors of guide rails that, you know, are different or—unique or different than other facilities that you've investigated and, you know—during any of your work or taught about?

A:      No, not really.  The guide rail functions as a tension member and it's steel and I teach about that and have designed those.  The end of the guide rail functions more or less—and here I'm talking about only the two steel posts—as somewhat of a sheer wall.  It's transferring a force directly to the ground.  And we do that routinely in building and bridge design. So the elements are there that are consistent with everything else I've done and understand.  And again, that's—that was my process in working on this.

(Doc. No. 85-2 at 8.)

The Court is persuaded that Dr. Thompson's experience and training in the relevant technical fields provide him with the necessary background and context.  Dr. Thompson holds a Ph.D. in Civil (Structural) Engineering, has "years of experience investigating and assessing highway accidents as a professional registered engineer in Pennsylvania" (Doc. No. 88 at 5), and has taught a variety of engineering courses at universities—including Civil Engineering Fundamentals, Construction Engineering & Management, Steel Design, Timber Design, Civil and Environmental Engineering Projects, and Structural Design (Doc. No. 85-1 at 26–27).  His qualifications are certainly well inside the "outer bounds" of expert qualifications.  See Elcock, 233 F.3d at 743 (finding that the district court did not abuse its discretion in qualifying an expert who had "no formal training in vocational rehabilitation").  And under Third Circuit precedent, it would be "an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  See Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 782 (3d Cir. 1996).  For the foregoing reasons, the Court finds that Dr.

Thompson is qualified to offer testimony as an expert in this case, and accordingly, turns to an assessment of the reliability of his opinions.

### 3.    Reliability

As to reliability, Plaintiffs argue that Dr. Thompson's "approach is mostly guesswork, and not the stuff of a reliable process." (Doc. No. 85 at 12.) They assert that his methodology is flawed in three ways: (1) "his entire analysis is animated by assumptions and guesswork that find little or no support in the record evidence"; (2) his methodology in the courtroom could not match "how he analyzes the same issues in the real world" because "evaluating the installation, maintenance, and/or failure of a guiderail is not something he has ever undertaken to do outside the courtroom"; and (3) his "assumption about how and where Plaintiff's car struck the guiderail is contradicted by the explanation given by Plaintiff in his deposition testimony." (Doc. No. 85 at 11–12.)

Defendants respond to each point in turn, arguing that: (1) Dr. Thompson "meticulously analyzed, among other things, the geography of the accident area, the general functionality of guiderails, numerous photographs of the incident, and highly detailed PennDOT diagrams of guiderail posts" (Doc. No. 88 at 7); (2) Plaintiffs' second argument is "nothing more than a repackaged qualifications argument" see (id. at 8); and (3) "Dr. Thompson is 'permitted to base his opinion on a particular version of disputed facts'" see (id.) (quoting Walker v. Gordon, 46 F. App'x 691, 696 (3d Cir. 2002) (unpublished)), and "Plaintiff may, of course, cross-examine Dr. Thompson on this issue at trial" see (id.).

Plaintiffs' arguments as to the reliability of Dr. Thompson's opinions are largely conclusory and do not cite to specific flaws in Dr. Thompson's methodology. Plaintiffs state, for

instance, that "his entire analysis is animated by assumptions and guesswork that find little or no support in the record evidence" (Doc. No. 85 at 11), but do not point to any examples of supposed shortcomings in Dr. Thompson's methodology to illustrate or support the claim.  See generally (Doc. No. 85).  Nonetheless, the Court, when assessing the reliability of a proffered expert's opinions, is required to act as a gatekeeper to ensure that the expert's opinion is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation."  See In re TMI Litig., 193 F.3d at 664.

Upon careful consideration of the parties' briefing and exhibits, and the applicable law, and for the following reasons, the Court finds that Dr. Thompson's opinions three (3) through seven (7) are the products of reliable principles and methods, but that opinions one (1) and two (2) are not and will therefore be excluded.  Dr. Thompson's opinions are cabined by what he acknowledges as insufficient information in certain respects:

> Without any of the evidence from the scene, an accurate scene diagram, and a download of the vehicle's data, it is not possible to reconstruct the accident and understand how and why it occurred as it did.

(Doc. No. 85-1 at 22.)  Given these constraints, Dr. Thompson mainly opines as to whether the Subject Guiderail was in a functional, safe condition at the time of the accident, rather than attempting to articulate how exactly the accident unfolded.

The Court will first address Dr. Thompson's opinions three (3) through seven (7), which relate to the condition of the Subject Guiderail, before turning to opinions one (1) and two (2), which involve Dr. Thompson's disputed assessment of where the vehicle struck the Subject Guiderail.  His method for assessing the condition of the Subject Guiderail consisted of employing various tools, as described in PennDOT's brief: he "analyzed, among other things, the

geography of the accident area, the general functionality of guiderails, numerous photographs of the incident, and highly detailed PennDOT diagrams of guiderail posts." (Doc. No. 88 at 7.) To assess the functioning of the guiderail posts, he also performed calculations to gauge how posts would react under idealized conditions, given certain assumptions:

> Figure 11 combines the information from Figures 9 and 10 to show the bending stress, $\underline{fb}$, on the post for the three different assumed support conditions. The demand on the post is the value of P multiplied by the distance to the assumed rigid support. The resistance of the post is given by either $\underline{SH}$ or $\underline{SC}$, depending on whether the rigid support is at a section with a hole or a solid section.
>
> Figure 11 (a) shows the desired in-place condition from the manufacturer's literature and the PennDOT drawing, that is, the top hole at grade. Figure 11 (b) shows the in-place condition of the post at the time of the accident with respect to the location of the top hole relative to grade. Figure 11 (c) shows the condition if the rigid support is at the bottom hole in the post.



Figure 11: Comparing Stresses for Different Support Conditions

Comparing the three conditions, the calculated bending stress is 5% greater for case (b) compared to (a), and 64% greater for case (c) compared to (b). Since P, the actual support condition, and the resistance of the post are not known, this primarily

serves to illustrate the large differences among varying assumptions. However, given that at least one of the posts failed below grade at what
appears to be the lower hole, assumption (c) is at least plausible. Since two of the posts failed below grade, for those posts that is the location where the demand on the post exceeded its resistance.

The resistance at the lower, buried hole could be even less than the ideal value calculated here. Assuming the posts were pressure preservative treated for ground contact, which is meant to protect the posts from rot, boring a hole in the post could weaken the post at that hole by more than just the loss of material. Pressure preservative treatment chemicals are injected into the wood from the outside, and often, complete penetration through the entire section is not achieved. This means that the wood in the center, which was exposed to the earth due to the hole, may not be as well protected as the rest of the post and may have deteriorated over the 21 years it was in the ground.

In summary, the posts will fail where the strength available is less than the load imposed on the post. There are a large number of variables involved in determining that location, and in this case, there is not sufficient information to do so. However, all the wood posts failed due to the accident, so the system generally worked as designed, they just may not have failed as predicted/desired, at the supposed preferential location.

(Doc. No. 85-1 at 12–13.)  To form his observational conclusions regarding the condition of the Subject Guiderail, Dr. Thompson compares the photographs from the scene to published standards by the Federal Highway Administration.  With respect to the questions of rotated blockouts and rail damage (each of which Dr. Coon identified as being dangerous) Dr. Thompson writes:

Figure 12 (annotations by author) shows the rotated blockouts on the end treatment section as they appeared in June of 2011. Later photos do not show any discernible differences from 2011, that is, the rotation is not greater.

While the blockouts have rotated, the rotations are small, and the blockouts are still in contact with the rear face of the rail. As long as the blockouts are in contact with the rail, they will be able to perform their intended function, which is holding the rail away from the posts so that vehicle wheels do not snag on the posts in the event of a collision.

…

33

> In Chapter II, three categories of functionality are presented that describe the extent of damage to an end treatment:
>
> 1.    End treatment no longer reasonably functional,
> 2.    End treatment should function adequately under a majority of impacts, and
> 3.    Damage should not affect the end treatment's ability to perform.
>
> Figures 15 – 17 show examples of the three levels of damage that FHWA defines. A comparison with Figures 12 – 14 shows that the damage existing on the guiderail at the time of the accident clearly falls into category 3, that is, the damage should not affect the guiderail's ability to perform its intended function.
>
> …
>
> Mr. Coon asserts, without any foundation, that what he identifies as, and calls nuisance damage is detrimental to the function of the guiderail. The damage to the rail is minor, and would not warrant a repair based on the FHWA guidance on guardrail repair.  Therefore, the nuisance damage did not affect the structural integrity or the ability of the end treatment to perform its intended function.

(Doc. No. 85-1 at 14, 17.)  Plaintiffs do not articulate specific objections to Dr. Thompson's calculations or to the other tools he employs.

The Court concludes that Dr. Thompson meets his burden to demonstrate that his process consists of reliable principles and methods.  Importantly, another expert could attempt to "reproduce the results originally generated" by his calculations.  See Elcock, 233 F.3d at 747. An application of the relevant Daubert factors supports this conclusion.  See In re Paoli, 35 F.3d at 742 n.8.  Dr. Thompson's calculations involve a testable hypothesis (factor one) and are controlled by familiar principles of physics and mathematics (factors four and five).  For his observational conclusions, he compared the condition of the Subject Guiderail to PennDOT diagrams, Federal Highway Administration resources, and other similar materials, which is a generally accepted method for identifying and remedying issues with guiderail and other traffic safety infrastructure (factors five and six)—for instance, Dr. Thompson cites to a Federal

Highway Administration report, the purpose of which is to "provide highway and maintenance personnel with up-to-date information on how to repair damaged W-Beam guardrail." (Doc. No. 85-1 at 15 (quoting Federal Highway Administration, W-Beam Guardrail Repair: A Guide for Highway and Street Maintenance Personnel (November 2008)).) Dr. Thompson's engineering background also accords certain weight to his process (factor seven). Finally, his reliance on industry resources and materials appears to be a trusted non-judicial use (factor eight). (Doc. No. 83-2 at 11 ("Keiser further testified that PennDOT and its contractors were required to follow PennDOT's construction design manual").)

As to opinions one (1) and two (2), which involve Dr. Thompson's disputed assessment of where the vehicle struck the Subject Guiderail, Plaintiffs seek exclusion because Dr. Thompson's "assumption about how and where Plaintiff's car struck the guiderail is contradicted by the explanation given by Plaintiff in his deposition testimony." (Doc. No. 85 at 11–12.) As to that specific argument, PennDOT may be correct that an expert is "permitted to base his opinion on a particular version of disputed facts." See Walker, 46 F. App'x at 696 (unpublished).[7] However, Dr. Thompson's method as to opinion one (1) is impermissibly limited to his "ipse dixit" and will thus be excluded. See Joiner, 522 U.S. at 146 (explaining that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"). As opinion two (2) is dependent on opinion one (1), it too will be excluded. Unlike opinions three (3) through seven (7), which involve assessments of the condition of the Subject Guiderail,

_____

[7] As previously stated, the Third Circuit has acknowledged that its unpublished opinions may contain persuasive reasoning. See Fuld, 604 F.3d at 823.

opinion one (1) involves a conclusion about how the accident transpired.[8]  At his deposition, Dr.

Thompson described how he concluded that the vehicle struck the Subject Guiderail

"downstream from the beginning of the end treatment":

> Q.    Okay. But I just wanted to kind of tie down and understand why this accident could not have, in your opinion, occurred with the car striking the end treatment, at the very end, on an angle such that the—the orange part gated to the driver's side?
>
> A.    If you look at Figure 3 in my report, that's almost impossible if it hits the way it's supposed to—not supposed to.  If it hits in a manner that would allow the system to gate out of the way, then the front end of the very end of the end treatment ends up at the front of the car. See that Figure 3?
>
> Q.    I do see Figure 3, but it's possible that the angle was different on that crash than in this crash, correct?
>
> A.    Most likely it was.
>
> Q.    Yeah.
>
> A.    But if you hit it on the end to force it to twist like that, then the end is at the front of the car.

(Doc. No. 85-2 at 27.)  This testimony matches the explanation in his report:

> If a vehicle strikes the guiderail at the upstream end, the end assembly is designed to gate, or fold out of the way, slowing the vehicle but allowing it to pass behind the guiderail. Figure 3 shows the gating action of the guiderail.

(Doc. No. 85-1 at 5.)  Still, neither of these descriptions provides a sufficiently robust set of

principles or methods by which to judge the conclusion, and they are not replicable or refutable.

---

[8]  Alternatively, to the extent that Dr. Thompson opines solely based upon his common-sense assessment of the photographs from the scene, that may constitute layperson testimony not based on specialized knowledge and therefore not a proper subject of expert testimony.  See Salem v. United States Lines Co., 370 U.S. 31, 35 (1962) (holding that "expert testimony not only is unnecessary but indeed may be properly excluded" where a factfinder is "as capable of comprehending the primary facts . . . as are [expert] witnesses . . . .").

See Elcock, 233 F.3d at 747. Under the Daubert factors, there is no testable hypothesis (factor one), Dr. Thompson does not cite studies or provide evidence of peer review (factor two), and, aside from his remark that an end-on collision would have been "almost impossible," there is no discussion of the potential rate of error (factor three). Factor three is particularly pertinent given that Dr. Thompson acknowledges the limits of what he can conclude without more information about the circumstances of the crash. His report states: "[w]ithout any of the evidence from the scene, an accurate scene diagram, and a download of the vehicle's data, it is not possible to reconstruct the accident and understand how and why it occurred as it did." (Doc. No. 85-1 at 22.)

In accordance with the foregoing, the Court will exclude Dr. Thompson's opinions one (1) and two (2) as unreliable, and turn to an assessment of the "fit" of his opinions three (3) through seven (7) to the facts of this case.

### 4.    Fit

As to fit, Plaintiffs assert that Dr. Thompson's opinions "must be excluded under the 'fit' prong of Rule 702," arguing that:

> Mr. Thompson's opinions are built almost entirely on guesswork. Plaintiff testified that he was driving his car in the left-hand lane of the interstate when a tractor-trailer from the middle lane attempted to enter his lane. See Ex. 5, at 6:24—8:25; 13:9-19. In an effort to avoid a collision with the tractor trailer, Plaintiff took evasive action to his left, therein leaving the roadway and ultimately striking the end treatment of the guiderail that was in the median of the interstate with the front driver's side of his vehicle. Id. Mr. Thompson stated that he assumed that Plaintiff's vehicle struck the guiderail, somewhere after the end cap, at a 90-degree angle, such that Plaintiff's vehicle was somehow traveling perpendicular to the roadway and the guiderail. See Ex. 2, at 84:15-24. There is no record evidence to support that assumption. Even worse, when pressed on the disparity, he had no explanation for how it might matter to his conclusions:

37

Q:      Okay.  So would your opinions change at all if this was a head-on strike with the end of the … treatment?

A:      I don't know how to answer that because it would be an entirely different accident.

(Doc. No. 85 at 12–13.)  PennDOT counters that "Plaintiffs' argument here is simply that Dr. Thompson's opinion as to where the car struck the guiderail contradicts Plaintiffs' version of events," which is "not grounds for exclusion."  (Doc. No. 88 at 8–9.)

Upon careful consideration of the parties' briefs and exhibits, and the applicable law, the Court concludes that Dr. Thompson's opinions three (3) through seven (7) fit the case.  The Court has already excluded Dr. Thompson's opinions about where the vehicle struck the Subject Guiderail, and Plaintiffs' argument is unpersuasive as to the remaining opinions.  Opinions three (3) through seven (7) will help the trier of fact to resolve either the applicability of sovereign immunity or the issue of negligence.  See Schneider, 320 F.3d at 404 (stating that "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact").

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' motion (Doc. No. 84) to exclude the opinions of Dr. Thompson, and grant in part and deny in part Defendant's motion (Doc. No. 82) to exclude the opinions of Dr. Coon.  An appropriate Order follows.